# EXHIBIT A

# PART 1 OF  3



UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re:                          Case No. 07-48694-WS

ROBERT JULIAO,                  Detroit, Michigan

                                Wednesday, August 25, 2009

            Debtor.
_____/

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE WALTER SHAPERO
UNITED STATES BANKRUPTCY JUDGE

TRANSCRIPT ORDERED BY:

        DAVID A. LERNER, ESQ.,
        (Plunkett Cooney)

A P P E A R A N C E S:

        Andrijana Vujic, Esq.
        (Hammerschmidt, Strickradt & Associates)
        117 W. Fourth Street, Suite 201
        Royal Oak, MI 48067
        For the Debtor

        Charity Olson, Esq.
        (Plunkett Cooney)
        Bloomfield Hills, MI 48304
        For the Creditor

AudioEdge Transcription, LLC
425 Eagle Rock Avenue
Roseland, New Jersey 07068
(973) 618-2310
www.audioedgetranscription.com

# I N D E X
## 8/25/09

DISCUSSION AS TO ADJOURNING HEARING          PAGE

                                               3
OPENING

    By Ms. Vujic                          13

    By Ms. Olson                          24


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE DEBTOR | | | | |
| MIDGE BAKER | 27 | 40 | 50 | |
| By the Court | 54 | | | |

1    (Proceedings begin at 1:34 p.m.)

2        THE CLERK:  This court is now in session, the

3    Honorable Walter Shapero residing.  You may be seated.

4        Calling case 07-48694, Robert Juliao.

5        THE COURT:  Appearances please?

6        MS. VUJIC:  Andrijana Vujic from Hammerschmidt,

7    Strickradt & Associates appearing on behalf of Mr. and Mrs.

8    Juliao.

9        MS. OLSON:  Good afternoon, Your Honor.  Charity

10   Olson appearing on behalf of Wells Fargo Bank.

11       THE COURT:  This is the date and time set for an

12   evidentiary hearing concerning debtor's motion for violation

13   of co-debtor's stay.

14       Are the parties ready to proceed?

15       MS. VUJIC:  I was hoping that the Court could guide

16   us a little bit in this situation, Your Honor.  I requested

17   interrogatories a while back, in May, and only just received

18   responses to the interrogatories on Friday.  I haven't had a

19   chance to subpoena any documents, or do a deposition.

20       I could try and proceed today.  I feel that my

21   questioning might be somewhat erratic because I don't really

22   have a base off of which to go.  The responses to the

23   interrogatories were somewhat scarce, and I don't have a whole

24   lot of information, at this point, as to how the credit

25   reporting system within Wells Fargo works, especially in

1  between different departments.  I would be willing to possibly

2  depose the Vice President of Default Reporting today, this

3  afternoon, and if we could maybe put off the evidentiary a

4  little bit.

5  THE COURT:  When did you pose the interrogatories?

6  MS. VUJIC:  May 5th, I believe.

7  THE COURT:  These are written interrogatories?

8  MS. VUJIC:  Yes, and they were filed.

9  THE COURT:  And served?

10  MS. VUJIC:  I'm sorry?  And served, yes.  The same

11  day.

12  THE COURT:  And the answers were required by when?

13  MS. VUJIC:  I didn't put any kind of deadline for --

14  THE COURT:  Well, the rules --

15  MS. VUJIC:  -- responses.

16  THE COURT:  -- require answers --

17  MS. VUJIC:  Twenty-eight days.  I apologize.

18  MS. OLSON:  If I may, Your Honor?  Thirty days under

19  the federal rules.

20  THE COURT:  Right.

21  MS. OLSON:  We have spoken a number of times

22  regarding the interrogatories, regarding the inquiries that

23  were there.  We did have an extension that was granted to

24  provide that information.  I spoke with sister counsel

25  probably three times on Friday, explained to her if there were

1  further inquiries that I would make myself available, in fact,

2  for the weekend.

3      We had spoke earlier in the week.  I had indicated

4  to her that Midge Baker, who was appearing on behalf of Wells

5  Fargo, was flying in for purposes of the hearing.  Ms. Baker

6  was not subpoenaed.  We produced her in good faith, in an

7  effort to resolve the matter that's before the court.

8      As this Court's well aware, this matter has been

9  pending since November.  There have been a number of

10  adjournments, most recently requested on behalf of debtor's

11  counsel.  And to the extent that Ms. Baker has gone through

12  the time and expense to make herself available to counsel, and

13  Your Honor, we would ask that we have an opportunity to

14  proceed with respect to the credit reporting that's at issue

15  in this case.

16      THE COURT:  You received the answers to the

17  interrogatories when?  Albeit, there's agreeable extensions, I

18  gather.

19      MS. VUJIC:  Yes, there was an agreeable extension,

20  Your Honor, but I just received them Friday afternoon, and I

21  did not subpoena Ms. Baker.

22      THE COURT:  Are you in position to depose the

23  witness, as opposed to having the evidentiary hearing?

24      MS. VUJIC:  I think the evidentiary hearing might

25  make more sense, in the long run, if I were able to depose Ms.

Baker first, and/or possibly subpoena additional documents.
From my understanding, Ms. Baker didn't bring any documents.
I wasn't able to subpoena any documents, as I had no answers
from interrogatories to work off of. I didn't subpoena her
also. So there's a possibility --

THE COURT: The interrogatories would have gave you
the name of that particular witness?

MS. VUJIC: Right. Yes. But only on Friday
afternoon.

MS. OLSON: This -- Your Honor, the name was
actually provided well in advance of that. When I indicated
that Ms. Baker was coming, would be here in Detroit, spent the
afternoon here in Detroit yesterday. Again, we spoke a number
of times. Today is the first time I've heard any of this.

Furthermore, Your Honor, if you will, the issue of
having an opportunity to send subpoenas to third parties,
there's been nothing, certainly, stopping the debtor's office
from doing that. It's my understanding that there was a
belief that the hearing, in fact, wouldn't go forward, and so,
again, I would plead with the Court, you know, if there are
other issues that counsel needs to tease out, that's --

THE COURT: Well, you said there's some
understanding the hearing wouldn't go forward?

MS. OLSON: Well, I think that there -- you know,
initially, there was a hope, I think, on the part of all of

the parties that there would be some sort of resolution.
Obviously, it's been docketed and prepared to go forward. You
know, there are some payment issues with the trustee. I think
that can be hashed out on another day, but we're certainly
prepared to go forward. I've indicated, and Ms. Baker's
indicated that she's happy to answer the inquiries that are
posed to -- posed by counsel today, Your Honor.

THE COURT: Well, I think, given the circumstances,
I wouldn't go forward with the hearing today, provided that
the fact that your witness is present, and available to be
deposed, and could be, as a result of that. Ultimately, her
testimony, by way of deposition, might be produced, but not
necessarily, I suppose.

My reaction to the circumstances is that I would
adjourn the evidentiary hearing, providing that the moving
party goes forward with the deposition of Wells Fargo's
witness today, and ask whatever questions you think are
appropriate, and then we'll talk about the other things that
might be necessary so we don't have to adjourn this hearing
again.

So I think that's what I'm going to rule. But tell
me what else -- and I know it's true, and I realize that there
may be things you don't know that may come out as a result of
the deposition, and that's an unknown, but given those
possibilities, you are prepared to take her deposition today?

1    MS. VUJIC:  Yes, Your Honor.

2    THE COURT:  And can it be arranged?  Any reason why

3    it can't be arranged?

4    MS. OLSON:  Ms. Baker does have a flight this

5    evening that she'll be taking.  I don't know how -- well --

6    MS. VUJIC:  We could do it in -- I have no

7    oppositions to doing it in the conference room here, if we

8    could just --

9    MS. OLSON:  Do we have a court --

10   THE COURT:  Do you have a court reporter?

11   MS. OLSON:  -- report to do this?

12   MS. VUJIC:  It doesn't necessarily have to be a

13   recorded deposition for our purposes, Your Honor.  We're

14   having sort of trouble establishing a chain of how information

15   is transferred within Wells --

16   THE COURT:  I understand you're trying to make your

17   case, and you're entitled to do that.  My suggestion that you

18   probably try and arrange for a court reporter, or (inaudible)

19   take advantage of her presence here today because you knew

20   that she was going to be here, and now that you put them to

21   the cost and expense of having her here.  So one way or

22   another, arrange for a deposition questioning of the witness

23   today and, primarily, by way of deposition, if you can find a

24   court reporter.

25   MS. VUJIC:  Okay.

1       THE COURT: That said, tell me what other kinds of

2   discovery, aside from what might result from the deposition?

3       MS. VUJIC: I might want to request documents that

4   Wells Fargo uses in their own accounting as to delinquencies

5   that are reported, delinquencies on the account, payments on

6   the account. In addition to that, how that information is

7   transferred from what I believe is handled by their Bankruptcy

8   Department to a Default Reporting Department, and then how the

9   Default or Credit Reporting Department shares that

10  information, or transfers it over to --

11      THE COURT: Well, you may find that out from

12  deposing this witness, or --

13      MS. VUJIC: Right.

14      THE COURT: -- or you may not. You may need to talk

15  to others.

16      MS. OLSON: Your Honor, if I --

17      THE COURT: Yes?

18      MS. OLSON: -- if I may, and this issue of a

19  deposition, again, this has completely caught me off guard,

20  having just heard the request moments ago. Is there any --

21      THE COURT: Do you want -- do you want some time? I

22  have nothing else scheduled today.

23      MS. OLSON: I guess --

24      THE COURT: Talk to counsel about it.

25      MS. OLSON: -- the question I had for Your Honor,

1    and certainly for opposing counsel.  You know, is there any

2    reason that this cannot be put on, and that this testimony be

3    provided here today?

4            THE COURT:  Well, we can take -- unless, somehow,

5    you feel you're not able to question the witness today.  You

6    probably have a fair sense of where you're going with this

7    witness.  What if we just take her testimony with a ruling

8    that you're entitled to call her again, at an adjourned

9    hearing?  In other words, take the testimony today, out of

10   order, but -- so you have it.

11           MS. VUJIC:  That --

12           THE COURT:  Then you have it, and you have sworn --

13   and you have it on the record, with my assertion, which I will

14   give you, that should it be necessary to recall her, or to

15   requestion her, that I

16   -- you will have that right.

17           MS. VUJIC:  And we would request some leeway in the

18   questioning, Your Honor, as I haven't had much chance to

19   investigate anything else, other than the answers to the

20   interrogatories.

21           THE COURT:  All right.

22           MS. OLSON:  That --

23           THE COURT:  What if --

24           MS. OLSON:   I'm sorry, Your Honor.

25           THE COURT:  You were about to say?

1   MS. OLSON:  Oh, I was going to say, you know, we did

2   discuss sort of the issue in having some leeway, and I know

3   our debtor and his wife are anxious to move this along.  And,

4   again, in the interest of judicial autonomy, we would be

5   perfectly willing to --

6   THE COURT:  What if I give you some time to review

7   the interrogatories, prepare a little more, and then we'll

8   take the testimony of this witness, adjourn the rest of the

9   hearing to another date, on the condition that you will --

10  that you will be entitled to recall this witness, should your

11  further investigation, and whatever else comes up is such that

12  you think it prudent to recall her?

13  MS. VUJIC:  Just about a half-hour, Your Honor --

14  THE COURT:  That would be fine.

15  MS. VUJIC:  -- right now, and then we'll come back,

16  if it's okay.

17  THE COURT:  All right.  That should just about give

18  you time, and I'll -- we'll reconvene --

19  MS. VUJIC:  Half-hour.

20  THE COURT:  I have nothing -- so 20 after two or so

21  --

22  MS. VUJIC:  Yes.

23  THE COURT:  -- we'll reconvene for the purpose of

24  taking this witness's testimony, out of order, and we'll

25  proceed under the -- thereafter, under the conditions I've

1     indicated.

2              MS. VUJIC:  Thank you, Your Honor.

3              THE COURT:  All right.

4              MS. OLSON:  Thank you, Your Honor.

5              THE COURT:  You're welcome.

6              THE CLERK:  All rise.

7              The court is in recess.

8              (Recess taken from 1:46 p.m. to 2:22 p.m.)

9              THE CLERK:  All rise.

10             This court is back in session.  You may be seated.

11             THE COURT:  Are we ready to proceed along the lines

12    indicated?

13             MS. VUJIC:  Could I make some opening remarks, Your

14    Honor?

15             THE COURT:  Yes.

16             MS. VUJIC:  I just wanted to give the Court a brief

17    overview of the case from the time that it was filed because

18    there's several things that have occurred.  Mr. Robert Juliao

19    filed the Chapter 13 on May 2nd, 2007, as the only debtor.

20    Tracy Juliao is Robert Juliao's wife, and she's a nonfiling

21    spouse in this case.

22             The plan was filed -- the original Chapter 13 claim

23    was filed on May 2nd, 2007.  It was set up to pay only Class 5,

24    property taxes, and seven percent to unsecured creditors.

25    That's how it was proposed.  The mortgages, both mortgages,

1  the first and the second, were set up originally to be paid

2  direct because my clients, at that time, believed they were

3  current.

4         Somewhere after the filing of the case, a proof of

5  claim was filed by Wells Fargo, actually on May 24, 2007, that

6  showed arrears in the amount of $1,823.88. A second proof of

7  claim was filed -- I think it was an amended proof of claim,

8  actually, by Wells Fargo, this is on the first mortgage, of

9  course

10 -- on August 22nd, 2007, that showed arrears in the amount of

11 $612.12. Based on that proof of claim, and this District's

12 rulings on that issue, because the proof of claim was filed

13 with an arrearage, we were required to amend the plan to pay

14 the mortgage, the first mortgage, through the plan.

15        We filed the amended plan on July 20th, 2007, to

16 treat the arrears. The first mortgage was being paid through

17 the amended plan, pursuant to the court's rulings. The second

18 mortgage was still being paid direct, and that's the plan that

19 was confirmed.

20        Shortly after confirmation, the trustee distributed

21 -- I'm sorry -- disbursed funds on the second mortgage, not

22 the first. This was in October 1st of 2007, and November 1st of

23 2007. I have a letter from the trustee, if Your Honor would

24 like to see it. It's Exhibit 1.

25        THE COURT: Well, let's have an understanding here.

1    I think we're confining the hearing to the testimony today of

2    the witness. And I appreciate the overview so I can get the

3    context, but that said, I think we ought to keep -- keep that

4    view of what we're going to do today, you know, in terms of

5    exhibits and other evidence, which would come in at later

6    time. So pardon the interruption, but I didn't want to go off

7    on a tangent.

8                    MS. VUJIC: Should I continue with the overview?

9                    THE COURT: Yes, I appreciate that.

10                   MS. VUJIC: All right.

11                   The trustee essentially corrected those

12   disbursements. What they had to do was disburse to the second

13   mortgage, which was a direct current payment, and not the

14   first. They did correct that. And shortly after that, in

15   January of 2008, Trot, on behalf of Wells Fargo, Trot & Trot,

16   filed a notice of default. We came to a resolution in the

17   form of a stipulation with Trot that extended the time to cure

18   the missed payments by my client.

19                   Mr. Juliao, at that time, became ill and was unable

20   to work. So there was a couple of payments in the Chapter 13

21   that were missed. The language in the stipulation with Trot,

22   as the resolution to the notice of default, gave my client,

23   essentially -- it had in the title an extended time to cure,

24   but the language within the stipulation didn't require any

25   kind of cure as to the missed payments in the Chapter 13. The

1    stipulation just read that all payments coming due between

2    January 31st, 2008 and November 1st, 2008 shall post timely.

3    There's no specific language or amount to cure the actual

4    default.

5             On November 7th of 2008, we filed this motion for

6    sanctions on behalf of Mr. Juliao, and it was adjourned to

7    February 2nd.  On February 2nd, the notice in default was

8    resolved again with a simple stipulation that the debtor

9    become current on the trustee's records.

10            At this point, Your Honor, what we were trying to do

11   in your communications with Trot & Trot, and Plunkett Cooney

12   on behalf of Wells Fargo was to have my client become

13   contractually current to the mortgage company, so then we can

14   proceed with a resolution for this motion for violation.

15            At that point, we were trying to request

16   reinstatement figures from Trot.  What happens is that Trot &

17   Trot is handling the file on a sort of Chapter 13 plan and

18   payment an accounting level and we had to deal with them as

19   far as any kind of moneys that would be due to make my client

20   contractually current on the mortgage.

21            We couldn't come to an understanding with them.  The

22   reinstatement figures that they requested didn't match our

23   accounting of what was necessary for them to become

24   contractually current, pursuant to what the trustee was paying

25   out.  At that point, my client became -- I'm sorry -- current

on the trustee's records.

The credit reports for my client from late in 2008 show -- there's various reports, a reinvestigation report, and other reports, that show arrearages of six to $8,000 of arrears. My clients have never been that far behind. The most that they were ever behind was about $3,000, and that was caught up.

The credit report still shows arrears of -- to this day, of about $3,800 and some change, and we can't figure out where that arrearage is coming from either because the clients are paid into the Chapter 13 plan at about 97 percent to date. A couple of months ago, they were paid in at 100 and plus percent. That varies a little bit, I think, depending on when the biweekly payment becomes due, and how quickly the payment gets there, and when it posts.

But, essentially, they're current in all ongoing payments onto the trustee's records, but the trustee is disbursing very erratically, and I have reports that indicate that. The credit reports showing these arrears is clearly incorrect, based on the trustee's records. What we're trying to figure out is what the internal accounting is by Wells Fargo, and how it's reported to the credit reporting agencies.

THE COURT: What's the date of the earliest credit report that is the basis for your motion? I just need the date, again, as part of the context.

1          MS. VUJIC:  It's -- it essentially is a

2    reinvestigation report where my client had written the credit

3    reporting company to investigate what these arrearages were,

4    and what they were based on, and what I have is dated August

5    21st, 2008.

6          THE COURT:  August 21st, 2008.

7          MS. VUJIC:  Yes.

8          THE COURT:  Okay.

9          MS. VUJIC:  The problem in this case, Your Honor, is

10   that my client has no control over disbursement by the

11   trustee.  She's required to make her -- or Mr. Juliao is

12   actually required to make his payments.  Mrs. Juliao -- he is

13   unable to work, and is disabled at this point.  So Mrs. Juliao

14   is the one who is essentially helping fund the household and

15   the plan.  She's making the payments.  She sends personal

16   checks that the trustee doesn't disburse.  They sometimes hold

17   -- and I don't know if that's their policy or procedure, and

18   if they do that on every case, but they hold personal checks

19   for 30 days before they disburse.

20          So for example, in August, my client made three

21   payments of -- that totaled to about $3200.  The trustee won't

22   -- I talked to them.  They won't disburse that until October.

23          THE COURT:  In other words, you're kind of saying

24   here, even though from your perspective, you made it totally

25   up to date, if the credit reporting is based on what the

1    trustee's record shows, and I don't know if it is or isn't,

2    but if it is, there's a possible disparity there because the

3    trustee may -- records may not reflect the facts as -- at

4    least the facts as you see them --

5              MS. VUJIC:  Right.

6              THE COURT:  -- because of the time lag, or payment -

7    -

8              MS. VUJIC:  Whatever the procedure might be.

9              THE COURT:  -- procedures, or things of that kind.

10   So it's -- I gather -- so it's possible that, for instance, on

11   the trustee's records, you're in default.  And these are

12   payments through the plan, right?

13             MS. VUJIC:  Right.

14             THE COURT:  And -- but you're not.

15             MS. VUJIC:  Right.

16             THE COURT:  But the credit reporting may be whatever

17   it is, and whatever it is may be based on -- more on the

18   trustee's records than what would be the fact from your

19   perspective in terms of payments to the trustee?

20             MS. VUJIC:  Right.  Payments -- the mortgage payment

21   the way it has to be paid per -- into our district's

22   requirements.

23             THE COURT:  I see.  All right.

24             MS. VUJIC:  Okay?

25             All the debtors have ever really wanted to do --

1    because it was such a small initial arrearage when the case

2    was filed -- was to become contractually current to the

3    mortgage company so that everything is up to date.  But in our

4    negotiations with Trot, in us trying to find what that correct

5    figure is, we haven't been able to come to a determination.

6          The most recent e-mail requesting more information

7    from Wells Fargo, through Trot, hasn't been responded to.  And

8    when I spoke to them last, they -- the attorney didn't have a

9    possible indication of what exactly is going on as far as her

10   understanding of the delinquencies on the account.

11         Mrs. Juliao is making the payments, as I said,

12   through the trustee, for a personal check.  They're not

13   disbursing regularly.  The co-debtor -- the co-debtor and the

14   debtor himself has made -- have made attempts to become

15   current contractually.  At some point, as I said, they've been

16   a hundred percent in their pay history to the trustee.  So

17   what we're trying to figure out is whether the credit report,

18   first of all, is being based on Wells Fargo's internal

19   accounting, where these delinquencies are coming from. From

20   everything that we see, my clients have complied with the

21   Chapter 13 plan and, yet, there are still huge arrearages that

22   are being reported.

23         THE COURT:  Was there some point at which you were -

24   - your client was delinquent to the trustee?

25         MS. VUJIC:  Yes.  That was when I had noted that Mr.

1   Juliao became ill and was no longer able to work, until Mrs.

2   Juliao picked up a second, and possibly even a third job at

3   that time.

4           THE COURT:  So what was the --

5           MS. VUJIC:  January 3rd, 2008 is when Trot filed the

6   notice of default.

7           THE COURT:  All right.  And at that point, was the

8   fact that the debtor was in default to -- under the claim, in

9   terms of payments to the trustee?

10          MS. VUJIC:  Yes.

11          THE COURT:  And that default continued for some

12  period of time?

13          MS. VUJIC:  Yes.  Because we had entered into a

14  resolution with Trot, by way of a stipulation, that's titled

15  "Extending time to Cure," that resolution came about somewhere

16  after January of '08.  And all that resolution required was

17  that my client make all the payments coming due to the Chapter

18  13 plan between January 31st of '08 through --

19          THE COURT:  Under this --

20          MS. VUJIC:  -- November 1st of '08.

21          THE COURT:  -- Docket No. 49, as an example, is a

22  stipulation dated -- filed 2/1/08.  Is that what you're

23  talking about?

24          MS. VUJIC:  Yes, the order was signed on February

25  5th, Docket No. 50, order modifying plan and extending time to

1    cure notice of default filed.

2            THE COURT:  That's Docket No. 50.  The order

3    pursuant to the stipulation?

4            MS. VUJIC:  Correct.

5            THE COURT:  So at that point, from your perspective,

6    you were no longer in default, or an order was entered

7    (inaudible).

8            MS. VUJIC:  At that point --

9            THE COURT:  You said you brought the procedure to

10   cure the default, even though there had been a default, but

11   now you're cure -- now you would cure it?

12           MS. VUJIC:  Right.  This is a stipulation that says

13   exactly what my client is supposed to do so that the default

14   is cured.  And this stipulation doesn't require any kind of

15   lump sum payment to cure that default.  We did, as I say,

16   later enter into an agreement to pay a lump sum to the

17   trustee, above and beyond what the Chapter 13 payment called

18   for, to cure the delinquency on the Chapter 13 records, on

19   (inaudible), there was a delinquency, and in order to become

20   contractually current, that's when we had entered into

21   negotiations with Wells Fargo by way of Trot & Trot, in order

22   to come with -- come up with a reinstatement figure, and a

23   proper figure that would cure not just the Chapter 13

24   delinquency, but also the arrearages, pre-petition, on the

25   mortgage.

1    My client essentially wanted to pay that directly to

2    the mortgage company because we've been having these issues

3    with the way the trustee disburses, and they're not disbursing

4    a regular ongoing monthly mortgage payment.

5          THE COURT:  Yes.  You said that.  Thank you.

6          All right.  Thank you.

7          Would Wells Fargo like to make some statement at

8    this point --

9          MS. OLSON:  Yes, briefly.

10         THE COURT:  -- before we take the --

11         MS. OLSON:  Very briefly, Your Honor.

12         THE COURT:  -- testimony?

13         MS. OLSON:  Thank you, Your Honor.

14         Our office was retained to respond to a motion that

15   was filed on the debtor's behalf, seeking sanctions against

16   Wells Fargo for what the debtor believed were violations of

17   the bankruptcy stay.  In essence, the allegations in that

18   motion set forth a couple of things, Your Honor.  Primarily,

19   that Mrs. Juliao who, herself, has not joined in the

20   bankruptcy.

21         THE COURT:  We're talking about the co-debtor's stay

22   primarily here.

23         MS. OLSON:  That's right, Your Honor.  That there

24   was a violation of that stay by virtue of the mere act of

25   credit reporting, with respect to Wells Fargo, which they're

1    legally required to do, under the Fair Credit Reporting Act.

2    There was some suggestion that the mere act of credit

3    reporting was, in essence, an attempt to circumvent the co-

4    debtor's stay, and that there was some indicia of willfulness

5    in that respect, with respect to sanctions.

6              For purposes of today's hearing, Wells Fargo has

7    voluntarily produced Midge Baker, who is the Vice President of

8    Default Reporting at Wells Fargo, to speak to the issues

9    pertaining to the credit reporting, the purpose for the credit

10   reporting, and, you know, the fact that his reporting is in no

11   way, shape, or form an attempt to circumvent the stay.

12             At the end of the day, while there do appear to be

13   issues, vis-a-vis the debtor, and the payments that are being

14   made to the trustee's office, we have an acknowledgment of an

15   arrears at the -- sort of beginning of the suit, or beginning

16   of the bankruptcy, Your Honor.  We know that there is an issue

17   as to default, and arrears, and not being current with respect

18   to the plan, you know, a year into the plan, which is

19   reflected in the stipulation that sister counsel referenced.

20             And as we sit here today, it's my understanding that

21   a call as recently as Friday to the trustee's office indicated

22   that while certain payments had been made in early August, by

23   Mrs. Juliao or Mr. Juliao, that those payments, in fact, will

24   not be disbursed until October.  So we certainly have a

25   situation where Wells Fargo hasn't created the arrears.  They

1   haven't created the default.  You know, they have no control

2   over, certainly, what the trustee is doing with respect to the

3   disbursements.  They merely are reporting as they are required

4   to do.

5           So while there may be issues pertaining to the

6   payment, I think the proofs will show at the end of the day,

7   be it today, be it later on, in a continued fashion, Your

8   Honor, that there's certainly no evidence that this reporting

9   has been done with any intention, willful or otherwise, to

10  circumvent the stay.

11          Thank you.

12          THE COURT:  Thank you.

13          Well, shall we call the witness?

14          MS. VUJIC:  Yes, Your Honor.  We'd like to call

15  Midge Baker.

16          THE COURT:  If you will go -- it looks like the jury

17  box.  That is our preferred witness stand.

18          THE WITNESS:  Okay.

19  M I D G E   B A K E R, DEBTOR'S WITNESS, SWORN.

20          THE CLERK:  Would you state and spell your first and

21  last name please?

22          THE WITNESS:  Midge, M-i-d-g-e, Baker, B-a-k-e-r.

23          MS. VUJIC:  Thank you.

24  DIRECT EXAMINATION BY MS. VUJIC:

25      Q    Ma'am, what position do you hold with Wells Fargo?