UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

ROBERT JULIAO,

              Debtors.

_____/

Case No.: 07-48694-wsd
Chapter 13
Hon. Walter Shapero

## OPINION REGARDING (1) THE DEBTOR'S MOTION FOR VIOLATION OF THE CO-DEBTOR STAY AND (2) SECOND APPLICATION FOR APPROVAL OF POST-CONFIRMATION ATTORNEY FEES

Before the Court are the Debtor Robert Juliao's and Mrs. Tracey R. Juliao's Motion Against Wells Fargo Bank, N.A. and America's Servicing Company For Violation of the Codebtor Stay and the Debtor's Chapter 13 counsel's Second Application for Approval of Post-Confirmation Attorney Fees. The Court held an evidentiary hearing on co-debtor stay motion and held a hearing on the fee application. The Court took the matters under advisement following the hearings, and the following is the Court's opinion.

### I.   BACKGROUND

Robert Juliao ("Debtor") filed his Chapter 13 bankruptcy petition on May 2, 2007. Debtor's wife, Tracy R. Juliao ("Tracy"), did not join Debtor's petition nor has she filed her own petition. On Schedule A, Debtor listed a debt to America's Servicing Company ("ASC"), the servicer for Wells Fargo Bank, N.A. ("Wells Fargo"), in the amount of $203,539.34, secured by a mortgage on Debtor's real property located at 29432 Granmercy Court, Farmington Hills, Michigan. Debtor also scheduled ASC as holding a second mortgage in the amount of $50,733.72. On Schedule H, Debtor

1

listed his wife Tracy as a co-debtor on the debts owed to ASC.  The Court confirmed Debtor's first amended plan on August 30, 3007.

Debtor filed a Motion Against Wells Fargo Bank, N.A. and America's Servicing Company For Violation of the Codebtor Stay" (Docket No. 68) ("Co-Debtor Motion").  Wells Fargo and AMS filed their Response Opposing Debtor's Motion (Docket No. 74).  The Court heard initial arguments on the Co-Debtor Motion and then set the matter for an evidentiary hearing, following which the Court took the matter under advisement.

On January 29, 2010, Debtor's counsel filed a Second Application for Approval of Payment of Post-Confirmation Attorney Fees (Docket No. 122) ("the Application") for services rendered from March 8, 2008 until January 20, 2010.  Prior to the Application being filed, Debtor filed an objection (Docket No. 117), and the Court held a hearing on the Application after which the Court took the matter under advisement.

The Court makes the following factual findings:

1.  As of the petition date, the Debtor and Tracy were delinquent in the amount of one-half payment on the first mortgage and therefore the Debtor was required to make payments to Wells Fargo through his Plan (December 2, 2009, Transcript, p. 32:4-5; 39:22-25) ("Dec. Trans.");  Tracy testified the arrearage was cured post-petition (id., p. 32:8-9);

2. Wells Fargo's initial proof of claim filed on May 24, 2007 claimed a total arrearage of $1,823.88 which included one payment due May 1, 2007 in the amount of $1,212.76 plus other charges and fees (Proof of Claim 7-1; Co-Debtor's Exhibit 2); Wells Fargo filed an amended Proof of Claim on August 22, 2007, claiming only a total arrearage of $612.12 for other charges and fees only (Proof of Claim 7-2; Co-Debtor's Exhibit 3);

2

3. Post-confirmation, Debtor missed three plan payments in November and December of 2007 due to an illness that resulted in his inability to work (Dec. Trans., p. 72:15; 73:1-3; 79:6, 17-18); Tracy then began making the plan payments on behalf of Debtor (id., p. 39:3-8) and cured the delinquency with the Chapter 13 Trustee's office with a lump sum payment in February of 2009 (id., 7-19);

4. Wells Fargo and Debtor filed a stipulation resulting in an Order Modifying Plan and Extending Time to Cure that required the Debtor to timely remit all plan payments to the Chapter 13 Trustee between January and November of 2008 and set forth provisions for allow Debtor three opportunities to cure a future default otherwise Wells Fargo would be permitted to submit an order vacating the stay as to the residence (Docket No. 50);

5. Tracy testified that some plan payments were remitted untimely to the Chapter 13 Trustee and therefore disbursement by the Trustee to Wells Fargo was also untimely (Dec. Trans., p. 40-41); Tracy further testified that she agreed that Wells Fargo accurately furnished information to the credit reporting agencies (the "CRAs") regarding past due amounts as of petition date and when plan payments were missed (id., p. 44:4-25);

6. As of August 24, 2009, two of Tracy's credit reports listed $3,879 as past due to Wells Fargo (Transunion, Co-Debtor's Exhibit 6; Equifax, Co-Debtor's Exhibit 8); Tracy testified that previously requested credit reports "consistently" showed late payments on the first mortgage held by Wells Fargo (Dec. Trans., p. 89-90);

7. ASC's November 12, 2009, mortgage statement, addressed to Debtor and Tracy stated it was "For Informational Purposes" and listed overdue payments in the amount of $3,799.40,

plus other late charges (Co-debtor's Exhibit 7); Tracy testified prior statements similarly stated essentially the same amount past due (Dec. Trans., p. 85:4-11)

8. Tracy holds several masters degrees and, at the time of the evidentiary hearing, was a psychologist employed by a hospital and as a faculty member at the University of Phoenix as well as at the University of Michigan's Dearborn and Flint campuses (id., p. 9-10); Tracy worked a combined 80 hours a week at these positions for a total yearly compensation of approximately $120,000 (id., p. 10:10, 23);

9. Tracy applied for full-time psychology positions paying between $100,000 - $1500,000 yearly and requiring only 40 hours a week (id., p. 10-11); Tracy testified she did not receive an offer because she could not receive the necessary security clearances "as a result of my credit report" (id., p. 11: 9-13; 31); Tracy also sought to obtain business loans and to lease commercial space to open her own psychology practice but was advised not to apply for the loans and was verbally rejected for leases due to her credit history (id. pp. 12-14; 22-24; 48);

10. Ms. Midge Baker, Vice President of Default Reporting for Wells Fargo, oversees the "credit reporting/credit dispute" unit, which handles the furnishing of credit information and credit disputes by customers (August 25, 2009, Transcript, p. 25) ("Aug. Trans."); Ms. Baker testified Wells Fargo adheres to the Credit Reporting Resource Guide, produced by the CRAs through the Consumer Date Information Association, which explains how creditors are to furnish information to the CRAs (id., p. 26); Ms. Baker also testified Wells Fargo's practices and procedures are consistent with those in the mortgage industry (id., p. 45); Ms. Baker is responsible for ensuring that a non-filing co-obligor's credit report does not reflect a bankruptcy petition being filed (id., pp. 27; 40);

4

11. Wells Fargo furnishes information to the CRAs in the "Metro 2 reporting format," which transmits to the CRA's data such as the obligors' social security number, monthly principal and interest payment, the contractual due date, and whether either the obligor or co-obligor filed a bankruptcy petition (id., p. 27);

12. Wells Fargo's furnishing of information to the CRAs is an automated process that simply shows whether a contractually due payment was missed (id., 33-34); The Metro 2 format does not differentiate between funds remitted directly by the obligor/co-obligor versus the Chapter 13 Trustee (id., 34); Wells Fargo furnishes information to the CRA's the same calendar day each month but Wells Fargo's computer system does not retain copies of the electronically transmitted credit files thereafter due to security concerns (id., pp. 35-36; 46)

13. Ms. Baker testified that Wells Fargo is required by the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et. seq.*("FCRA"), to report accurately and completely as to all customers and agreed that Wells Fargo would be in violation of the FCRA if it failed to report that a non-filing co-debtor was delinquent or in default (id., pp. 40-41);

14. The "source of the information" furnished to the CRAs is Wells Fargo's records system, not the Chapter 13 Trustee's records (id., p. 51); The Metro 2 format does not allow information showing that a court order granted a debtor or co-debtor an extension of time to cure arrearages (id., p. 54).

## II.   DISCUSSION

The primary motion before the Court is the Debtor's motion alleging a violation of the automatic stay, 11 U.S.C. § 362(a)(6), and the co-debtor stay, 11 U.S.C. § 1301. The Co-Debtor Motion seeks a finding that Wells Fargo (and ASC) violated the stay "as to the co[-]debtor" and

requests damages in the amount of $20,000, plus fees and costs, pursuant to § 362(k). (Debtor's Motion, p. 3). The Application seeks approval of compensation for Debtor's counsel's post-confirmation services rendered between March 8, 2008 and August 31, 2011. Because a decision on the Application necessarily depends on the outcome of the Co-Debtor Motion, the Court addresses latter before considering the former.

A. Primary Motion

As a preliminary matter, at the initial hearing Wells Fargo argued for the first time that the Debtor, as the movant, did not have standing to bring the motion on behalf of Tracy, the co-debtor. Wells Fargo asserted that Tracy, as the co-debtor, must bring the motion. When asked by the Court at that hearing about standing, Debtor's counsel stated, without contradiction, that she also represented Tracy in the matter. On this basis, the Court finds that Tracy joined the motion sufficiently, notwithstanding its title asserting the Debtor as the only movant and the motionm should be considered as one brought by both the Debtor and his wife. Moreover, Wells Fargo did not cite any statute or other authority precluding a debtor from seeking damages for an alleged violation of the co-debtor stay. In contrast, research reveals that Courts have generally allowed a debtor to file a motion alleging a violation of § 1301 without precluding such based on lack of standing. *See*, *e.g.*, *Morris v. Zabu Holding Company, Inc. (In re Morris)*, 385 B.R. 823, 826 (E.D. Va. 2008) (debtor filed motion that "alleged, in summary, that the foreclosure sale [the mortgagee] conducted on Debtor's property violated the co-debtor stay under 11 U.S.C. § 1301"); *In re Bertolami*, 235 B.R. 493, 495 (Bankr. S.D. Fla. 1999) (debtor filed a "Motion for Sanctions for Violation of the Automatic Stay" based solely on an alleged violation of § 1301 due to the mortgagee obtaining a deficiency judgment against the non-filing co-debtor spouse); *In re Hughes*,

6

No. B0580389C13D, 2005 WL 1293982, at *1 (Bankr. M.D.N.C. May 2, 2005) (debtor filed

"Motion for Sanctions" based on alleged violation of § 1301(a) and sought damages pursuant to §

362(k)). Based on the foregoing, and because the Court also finds that Wells Fargo abandoned this

argument by not timely raising it either at the evidentiary hearing or in its post-hearing brief, the

Court overrules Wells Fargo's indicated objection to the motion based on lack of standing.

### 1. Claimed § 1301(a) violation

The threshold issue in the Co-Debtor Motion is whether Wells Fargo's furnishing of

information to the CRAs regarding past due amounts owed by Tracy violated § 1301(a). The Debtor

argues Wells Fargo "violated the automatic stay by consistently reporting arrearages and assessing

late charges on [Tracy's] credit report." (Debtor's post-hearing Brief in Support, p. 2). Wells Fargo

argues that "[n]o evidence was offered to show that the reporting was made for the purpose of

collecting money from the Debtor or [Tracy]" or that it "acted with the intent of coercing or

harassing the Debtor or [Tracy] into paying" the past due amounts. (Wells Fargo's Post Hearing

Brief, p. 9).

Absent exceptions not present here, § 1301(a) provides that "after the order for relief under

this chapter, a creditor may not act . . . to collect all or any part of a consumer debt of the debtor

from any individual that is liable on such debt with the debtor, or that secured such debt[.]" "Section

1301(a), the codebtor stay, prohibits a creditor from acting to collect any part of a consumer debt

from a person that is liable on the debt with a Chapter 13 debtor. Its purpose is to protect the debtor,

not the co-debtor." *Brooks v. General Motors Acceptance Corp. (In re Brooks)*, 340 B.R. 648, 655

(Bankr. D. Me. 2006) (citations omitted). "[T]he co-debtor stay found in section 1301(a) was

designed to protect a debtor operating under a Chapter 13 individual repayment plan case by

7

insulating him from *indirect pressures* from his creditors exerted through friends or relatives that may have cosigned an obligation of the debtor." *In re Dunlop*, 378 B.R. 85, 94 (Bankr. E.D. Pa. 2007) (quotation marks and cite omitted; emphasis added). *See also In re Morris,* 385 B.R. at 830 n.8 (Section 1301(a) "was enacted, not to protect co-debtors, but to prevent creditors from circumventing the § 362 automatic stay by putting indirect pressure on the debtor through her co-debtors."); *Harris v. Margaretten & Co., Inc., (In re Harris)*, 203 B.R. 46, 51 n.2 (Bankr. E.D. Va. 1994), *aff'd* 100 F.3d 950, 1996 WL 659434 (4th Cir. Nov. 14, 1996) ("Section 1301 was intended primarily for the benefit of the principal debtor by relieving the debtor from pressures which creditors might exert on those codebtors close to the debtor.").

The Court concludes that Wells Fargo's furnishing of information to the CRAs was not an act to collect its debt from Tracy and therefore did not violate § 1301(a). Wells Fargo passively furnished information to the CRAs regarding whether the contractually due payments were past due based on internal records showing the date Wells Fargo received payment from the Chapter 13 Trustee. Tracy acknowledged at the evidentiary hearing that certain payments made pursuant to the Debtor's confirmed plan were not timely remitted to the Chapter 13 Trustee and further agreed that such resulted in delaying the Trustee's distribution of payments to Wells Fargo. (See Exhibit 9 (Chapter 13 Trustee's report detailing receipt of payments from the Debtor and payment to Wells Fargo/ACS) and Exhibit A (Wells Fargo's payment history as to the Debtor and Tracy)). Tracy further testified, however, that it was her understanding that because Wells Fargo's claim was required to be paid through the Debtor's plan, even if the Trustee did not remit payment to Wells Fargo by the contractual due date the automatic stay prevented the reporting of any late payments. In other words, Tracy apparently believed that timely payment to the Trustee sufficed as timely

8

payment to Wells Fargo even though Wells Fargo in fact received the payment from the Trustee after the contract due date (Dec. Trans., pp. 58-59). Tracy does not offer any authority supporting this interpretation of § 1301 and the Court finds no such restriction in its language. Section 1301 prohibits acts to collect on a debt, not the furnishing of information to third-parties related to whether a creditor timely received the payment on the contractual due date.

Moreover, Ms. Baker credibly testified that the credit file Wells Fargo electronically transmitted to the CRAs simply furnished information from its records as to the due date and whether the payment was timely received, irrespective of the source of the payment. It was her view that "[t]he purpose of credit reporting is not to collect on a debt. It's to advise the financial community . . . through accurate and complete reporting." (Aug. Trans., p. 42: 16-18). Wells Fargo had no control over the acknowledged delay in the Trustee's remittance of the payments, whether that delay stemmed from Tracy's failure to timely remit plan payments to the Trustee or the Trustee's own internal procedures and policies for distribution. Again, Tracy acknowledged that at least three plan payments were missed in November and December and that the Trustee had returned checks to her at least once. She also agreed that there has not been a perfect payment history in this case. Based on testimony and exhibits introduced at the evidentiary hearing, Wells Fargo furnished to the CRA's information related to whether Tracy's contractually due payment was in fact received timely by Wells Fargo. This was not an act to collect but is more properly viewed as the passive dissemination of information that it would appear federal law required Wells Fargo to furnish.

As noted, the focus or purpose of § 1301 is "not to protect co-debtors, but to prevent creditors from circumventing the § 362 automatic stay by putting indirect pressure on the debtor

9

through her co-debtors." *In re Morris,* 385 B.R. at 830 n.8. When asked on direct examination whether she felt pressure to cure any arrears, Tracy answered "[n]o." Rather, the "issue" was the "[s]imple reporting of . . . arrearages and late payments is what has been causing significant problems" with respect to her efforts to obtain credit or enter into business agreements (Dec. Trans., p. 37: 3-8). And when asked on cross-examination whether she had any evidence to support her position that Wells Fargo furnished information regarding the late payments in an effort to collect the debt from the Debtor, Tracy answered that her only evidence was "the late reporting as well as the [mortgage] statements." (id., p. 68:6-8). Thus, the evidence does not support a conclusion that what Wells Fargo did in this case ran afoul of the indicated apparent purpose of the statute or affected Tracy's apparent ability to obtain credit.

The facts and circumstances of this case are readily distinguishable from other cases where courts have found a violation of § 1301(a). For example, the court in *In re Hughes* found "a willful violation of the codebtor stay" where the creditor, JC Penny, contacted the debtor's mother, the co-debtor on the account, at least 10 times post-petition demanding payment. *In re Hughes*, 2005 WL 1293982, at *1. A more egregious example of a creditor's violation of § 1301(a) occurred when a co-debtor, after being called by the creditor requesting payment, called the debtor and threatened to kill the debtor unless the debt was paid. *Spires v. Gracewood Federal Credit Union (In re Spires)*, 1991 WL 11002451, at *1 (Bankr. S.D. Ga. Feb 21, 1991). *See also Patti v. Fred Ehrlich, PC*, 304 B.R. 182, 187-88 (E.D. Pa. 2003) (district court affirmed the bankruptcy court's finding of a violation of § 1301(a) because the creditor-attorney prosecuted an action in state court and obtained a judgment against the co-debtor-spouse with full knowledge of the existence of the co-debtor stay); *Bell v. Assocs. Financial Serv. Co. of Ala. (In re Bell)*, 1993 WL 13005092, at *1-2

10

(Bankr. S.D. Ga. Jul 13, 1993 (creditor, despite a provision in the debtor's plan to pay the creditor in full, called the co-debtor-father, informed him of his debtor-son's bankruptcy, and "threatened to destroy the father's credit rating if payments were not made" ). While these cases were not cited by either party, what can be gleaned therefrom is that a co-debtor stay violation requires the creditor to act in an overt and intentional manner or which has the inescapable and inevitable effect of exerting pressure on the debtor by way of the co-debtor.

The facts of this case are not such. Wells Fargo furnished information to the CRAs related to whether it timely received the contractually due mortgage payments. Wells Fargo did not call either the Debtor or Tracy with any demands that the payments be made or threaten to ruin Tracy's credit. Nor did Tracy feel that she must cure the arrearages and she certainly did not threaten to kill the Debtor as a result of the information furnished by Wells Fargo and reported by the CRAs. Most telling is the lack of any testimony from the Debtor indicating he felt pressured to pay the debt due to the information reported on Tracy's credit reports. Even though one court in this Circuit has held that merely furnishing of information that results in an adverse notattion being reported on the co-debtor's credit report may be a violation of § 1301, *In re Sommersdorf*, 139 B.R. 700, 701-02 (Bankr. S.D. Ohio 1991), most courts hold that it must be shown that a creditor acted "with the intent of coercing or harassing the bankrupt debtor into paying the debt," *In re Singley*, 233 B.R. 170, 173 (Bankr. S.D. Ga. 1999). *See also Mahoney v. Washington Mutual, Inc. (In re Mahoney)*, 368 B.R. 579, 585-86 (Bankr W.D. Tex. 2007) (emphasis in original) ("While it may have been true in *Sommersdorf*—as a factual matter—that the creditor intended to spur collection of the debt when affirmatively placing an entry in the co-obligor's credit report, it is too great a leap to say, as a matter of *law*, that the mere reporting of a debt to a credit agency is a *per se* violation of the

11

discharge injunction."); *Irby v. Fashion Bug (In re Irby)*, 337 B.R. 293, 297 (Bankr. N.D. Ohio 2005) (in context of alleged violation of discharge injunction court concludes that "since nothing has been alleged, beyond the mere reporting of the obligation, that the [d]efendants undertook any 'action' or 'act' to collect on their claim, the Plaintiffs' pleadings do not present a viable cause of action"). "The act of credit reporting *could* be part of a larger course of conduct that, taken together, might constitute an act likely to be effective to collect a debt[.]" *In re Mahoney*, 368 B.R. at 589 (emphasis in original). While the Court is not unmindful of Tracy's credible testimony that she lost out on securing potential jobs, loans, or business arrangements due to the information on her credit reports, the facts of this case fail to sufficiently show that Wells Fargo engaged in the kind of conduct constituting a prohibited act to collect its debt from either the Debtor or Tracy.

Lastly, as respects the alleged inaccuracy of the information furnished by Wells Fargo, under Tracy's understanding that timely payment to the Trustee constituted timely payment to Wells Fargo, the Court expressly offers no opinion such but suggests and states that Tracy's remedy in that regard likely and more properly lies in an action brought pursuant to the FCRA. *See*, *e.g.*, *In re Dendy*, 396 B.R. 171, 183 n.12 (Bankr. D.S.C. 2008) ("To the extent Debtors' credit reports are inaccurate, as a result of the discharge order or otherwise, Congress has provided a statutory framework through which Debtors may dispute inaccurate information. *See* 15 U.S.C. § 1681 et seq. [i.e, FCRA]"); *Chungag v. Wells Fargo Bank, N.A.,* No. 10-14648, 2011 WL 672229, at *5 (E.D. Mich. February 17, 2011) (allegations that creditor furnished inaccurate information to CRAs falls under § 1681s-2 of FCRA).

**2. Wells Fargo's acts also do not rise to the level of civil contempt**

As the Court has found that Wells Fargo's furnishing of information was not an act to collect, the Court need not decide whether § 1301(a) permits an award of damages. The Court does note that courts are split on that issue. *Compare In re Morris*, 385 B.R. at 831 ("While § 362(k) imposes damages for any willful violation of the automatic stay, § 1301 does not contain a similar provision), *In re Stacker*, No. 10-30262, 2011 WL 182846, at *2 (Bankr. S.D. Ill. Jan. 20, 2011) (finding a "lack of damages remedy for a violation of the co-debtor stay"), *and In re Hughes*, 2005 WL 1293982, at *1 ("Section 1301 does not however provide for sanctions for a violation of the co-debtor stay. . . . The sanctions imposed under 362[(k)] are expressly limited to violations under 362 and do not extend to Section 1301.") *with In re Bertolami*, 235 B.R. 493, 498 (Bankr. S.D. Fla.1999) (granting the debtor's motion for sanctions for violation of the co-debtor stay and reserving jurisdiction to determine damages under § 1301(a)), *In re Sommersdorf*, 139 B.R. 701 (noting that while § 362(k) provides for damages for stay violation and that "there is no such similar provision in § 1301[,]" the "legislative history is clear that both provisions serve to protect the debtor" thus court reserved decision on damage award to co-debtor), *and In re Bell*, 1993 WL 13005092 ("'individual injured' for purposes of Section 362[(k)] includes a co-debtor protected by Section 1301 if the act which violates Section 362 also injures the co-debtor").

Courts have also found, however, that allegations of violation of the co-debtor stay may be remedied pursuant to civil contempt standards. "[S]ome courts have imposed damages for willful violations of the co-debtor stay in reliance on . . . 11 U.S.C. § 105(a)[.]" *In re Morris*, 385 B.R. at 831 n. 11 (collecting cases). "A bankruptcy court may redress violations of a stay effective under the authority of 11 U.S.C. § 1301 through the power granted to it under the

13

Bankruptcy Code. 11 U.S.C. § 105(a). Violation of a bankruptcy stay, which is an injunction with the force of an order, may give rise to civil contempt." *Patti,* 304 B.R. at 187. The Co-Debtor Motion did not seek relief on the basis of civil contempt. Nonetheless, since persuasive authority holds that relief may be granted on such a basis, and because civil contempt does not require a finding of willfulness, the Court will examine whether Wells Fargo's actions rise to the level of civil contempt.

"Undoubtedly included within the court's § 105(a) powers is the authority to find a party in civil contempt for . . . violations of the Bankruptcy Code and/or Rules[.]" *French v. American General Financial Services (In re French)*, 401 B.R. 295, 314 (Bankr. E.D. Tenn. 2009). "To hold a party liable for civil contempt, the complainant must establish three elements by clear and convincing evidence: (1) the alleged contemnor had knowledge of the order which he is said to have violated; (2) the alleged contemnor did in fact violate the order; and (3) the order violated must have been specific and definite." *Hunter v. Magack (In re Magack)*, 247 B.R. 406, 410 (Bankr. N.D. Ohio 1999) (citing *Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir.1998); other citation omitted). Courts have emphasized that "[w]illfulness is not an element of civil contempt and intent to disobey the order is irrelevant." *In re Walker*, 257 B.R. 493, 497 (Bankr. N.D. Ohio 2001) (citing *Rolex Watch, U.S.A., Inc. v. Crowley,* 74 F.3d 716, 720 (6th Cir. 1996)). The movant bears the burden of establishing the elements of civil contempt by clear and convincing evidence. *Id*.

Of the civil contempt elements, only the second is at issue. Section § 1301(a) is an injunction against acts to collect a pre-petition debt and an order of this Court. *Patti*, 304 B.R. at 187. In addition, § 1301(a) is clearly specific and definite in terms of what is prohibited. The

14

question is whether Wells Fargo acted to collect its debt by furnishing of information to the CRA's related to past due amounts and thereby violated or disobeyed this Court's order, i.e., §1301(a). That question is easily answered here by reference to the Court's discussion above wherein the Court has held that Wells Fargo's act did not violate § 1301(a). Therefore, even if the Court grants an generous reading to the Co-Debtor Motion, in light of case law permitting alleged violations of § 1301(a) to be remedied under contempt standards, the failure to prove all three elements precludes a decision in favor of Debtor or Tracy.

In summary, the Court holds that Wells Fargo did not violate § 1301(a) by furnishing information to the credit reporting agencies that payments owed by Tracy, the co-obligor and co-debtor, were past due. In addition, because Wells Fargo did not violate the co-debtor stay, the facts do not support a finding of civil contempt. The Court therefore denies the Debtor's and Tracy's motion for sanctions.

II. Second Fee Application

The Court now considers the Fee Application filed by Debtor's former counsel, Hammerschmidt, Stickradt & Associates (the "Applicant"). The Applicant seeks a total of $9,914 in fees for services rendered between March 8, 2008, through January 20, 2010. The Application includes a summary of hours worked by each attorney. Ms. Marguerite Hammerschmidt rendered a total of 12.2 hours at $250.00 per hour. Ms. Andrijana Vujic rendered a total of 35.2 hours at $195.00 per hour. Per this Court's request, the Applicant also re-filed its detailed summary of the services rendered to separately list those services rendered in connection with the Co-Debtor Motion. The amended summary shows that Ms. Hammerschmidt spent 5.1 hours and Ms. Vujic

15

spent 28.2 hours of their respective hours on services connected to the Co-Debtor Motion, which is $6,674.00 of the $9,914 total compensation sought in the Application.

The Applicant's affidavit (Docket No. 123) describes the "numerous problems with the non-filing co-debtors [sic] credit" resulting from the Trustee's mistaken payment to the second mortgagee, and that the Applicant worked with Tracy, the mortgage companies, and the CRAs in an effort "to fix the [alleged] inaccurate reporting on the credit report." The affidavit also describes that the Applicant tried to resolve the purported erroneous reporting for a year as well as handled the "extensive discovery" required in preparing for the evidentiary hearing.

The Debtor's objection argues that the Applicant never discussed with the Debtor and Tracy that they would be billed any amount over the original fee agreement. The Debtor also contends that Tracy discovered the erroneous mortgage payments and passed that information on to the Applicant. In addition, the Debtor argues that Tracy spent several months researching various issues and providing the results of her work to the Applicant. The Court held a hearing on the Application at which the Debtor and the Applicant presented arguments in support of their positions.

"In a Chapter 13 case, section 330(a)(4)(B) provides that the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case." *In re Blackburn*, 415 B.R. 668, 688 (Bankr. N.D. Ill. 2009). "A bankruptcy court is afforded broad discretion in determining attorney's fees." *Thomas v. Robinson (In re Robinson)*, 189 Fed. App'x 371, 373 (6th Cir. 2006). "While the burden is on the applicant to justify a fee request, the bankruptcy court must expressly discuss the amounts that are not supported by the application and provide a reasoning to support the court's decision." *In re Williams*, 357 B.R. 434, 438–39 (B.A.P. 6th Cir. 2007) (citation omitted).

16

"The Sixth Circuit Court of Appeals has directed that bankruptcy courts should use the lodestar method in determining reasonable attorney fees under § 330(a) of the Bankruptcy Code." *In re Williams*, 378 B.R. 811, 822 (Bankr. E.D. Mich. 2007) (Shefferly, J.) (citing *Boddy v. United States Bankruptcy Court ( In re Boddy)*, 950 F.2d 334, 337 (6th Cir.1991)). "The starting point in the lodestar analysis is to determine a reasonable hourly rate. . . . The next step in the analysis is to determine the lawyer's reasonable hours." *Id*. (citation omitted). The Debtor's objections do not challenge whether the hours requested were actually rendered nor the reasonableness of the rates charged. While the Court nonetheless has an obligation to "ask whether the rate charged for the service is reasonable in light of the complexity and importance of the task[,]" *Boyd v. Engman*, 404 B.R. 467, 477 (W.D. Mich. 2009), that inquiry will not be necessary here..

The Court's central focus here is on the second step in the lodestar analysis, the reasonableness of the hours rendered by the Applicant, and in particular the hours expended litigating the Co-Debtor Motion. The pivotal "question is whether these post-confirmation services were necessary or beneficial to either the Debtor's estate or the Debtor." *In re Williams*, 378 B.R. at 825 (Shefferly, J.). *See also In re Phillips*, 291 B.R. 72, 81 (Bankr. S.D. Tex. 2003) ("[T]he lodestar is the beginning, not the end (or necessarily even the most important factor) stated in the statute. Section 330 requires the court to consider the benefit of the services to the debtor and the necessity and benefit of the services to the completion of the case."). Under this part of the analysis, the Court "shall consider the nature, the extent, and the value of such services" through consideration of a non-exclusive list of factors. 11 U.S.C. § 330(a)(3).

A bankruptcy court, however, is statutorily precluded from awarding compensation "for . . . unnecessary duplication of services[,]" "services that were not reasonably likely to benefit the

17

debtor's estate[,]" or services that were not "necessary to the administration of the estate. § 330(a)(4)(A)(i) - (ii). A "majority of [c]ourts agree that the results obtained is a major factor in determining whether the services at issue bestowed a benefit upon the estate." *In re Allied Computer Repair, Inc.*, 202 B.R. 877, 886 (Bankr. W.D. Ky. 1996). "'Courts are to consider the necessity of the services at the time they were rendered, not at the time the court reviews the application. In order to benefit the estate, the services rendered must relate to a realistically obtainable goal.'" *In re Williams*, 378 B.R. at 823 (Shefferly, J.) (quoting *In re Polishuk*, 258 B.R. 238, 249 (Bankr. N.D. Okla. 2001)).

The Court concludes that the hours rendered in connection with the Co-Debtor Motion did not benefit either the Debtor or the Debtor's estate. First, the services rendered by the Applicant could were not necessary at the time and could not have reasonably benefitted the Debtor or his estate. *In re Williams*, 378 B.R. at 825-26 ("The first question that has to be asked and answered by a debtor's counsel in rendering post-confirmation services is whether those services are reasonably likely to benefit the debtor if not the estate."). The issues surrounding Tracy's credit report dealt with her inability to obtain new employment or credit to start a new business. According to Tracy, obtaining either would have brought more peace and stability through less hours for the same pay. While this arguably would have benefitted the Debtor's home life and martial relationship, it is a personal benefit that is not sufficient enough of a benefit nor was it necessary for the administration of the estate. *See id*. at 824 (personal benefits derived by a debtor do not suffice as benefit to estate for purposes of fee application).

Second, the amount of hours expended are disproportionate considering the lack of results obtained. *Id*. at 826 ("[T]he next question becomes whether the burden of the fees being incurred

18

is disproportionate to the benefit to be gained by the debtor.).  From the amended summary detail, the Applicant spent 33.3 hours of the 47.4 total hours rendered post-confirmation on the Co-Debtor Motion, which is 70% of the hours requested in the Application.  This simply is too many hours spent seeking sanctions that were questionable based on the lack of showing coercing or harassing actions by Wells Fargo.  "[W]hen a professional's efforts have failed to produce a significant benefit, the task of proving the reasonableness of the fees to the Court becomes unsurprisingly more difficult."  *In re Unitcast, Inc.*, 214 B.R. 992, 1009 (Bankr. N.D. Ohio 1997).

Lastly, and most importantly, is the fact that both the Applicant and Tracy acknowledge that the Applicant was also representing Tracy in the Co-Debtor Motion.  That motion sought a remedy for Tracy's, not the Debtor's, damages associated with allegedly inaccurate credit reports.  A debtor's counsel, however, is limited to "representing *the interests of the debtor* in connection with the bankruptcy case."  *In re Blackburn*, 415 B.R. at 688 (emphasis added).  In light of the unwritten agreement that the Applicant was representing Tracy, the Court is not persuaded that now the Debtor's Chapter 7 case must bear the burden of those fees as an administrative expense.  This is particularly critical in light of the lack of reasonably foreseeable benefit to the Debtor or his estate and the ultimately adverse result.  The Applicant chose to provide legal services to Tracy with the goal of rectifying alleged inaccurate reporting and should properly look solely to Tracy, and not the Debtor's estate, for any payment of those services.

This conclusion is supported by the parties' arguments to the Court at a hearing on the Application.  The Debtor and Tracy argued there they understood from a purported conversation with an attorney for the Applicant that any fees related to the Co-Debtor Motion would come from any damages awarded as a result of the Motion.  This suggests they understood some type of

19

contingency fee arrangement existed for the Applicant's services related to the Co-debtor Motion. The Debtor and Tracy further contended that the same attorney sent them an email allegedly stating that the attorney was assisting Tracy out of a sense of personal responsibility or as a goodwill gesture, but not in connection with the Debtor's case because co-obligor credit reporting issues were not related to the administration of the estate. The Applicant first agreed that credit reporting issues were non-bankruptcy issues but then contended that the Debtor and Tracy allegedly repeatedly asked the Applicant for over 4 months to take some action on the issue. The Applicant further stated that based on this insistence it had no choice but to acquiesce and file the Co-Debtor Motion. The Applicant, however, disputed that the Code or bankruptcy Rules allowed it to work on a contingency basis.

Regardless of the truth of the parties' assertions, their arguments clearly reinforce this Court's conclusion that the Applicant primarily and really represented Tracy in what was a non-bankruptcy issue that neither benefitted the Debtor or was necessary to the administration of the estate. The Court, in particular, "rejects any suggestion that the [Applicant] should be awarded all of its fees and costs simply because it was only doing what its client wanted to do." *In re Williams*, 378 B.R. at 827. "Just because a client wants to embark on a course of action does not mean that the lawyer is obligated to assist the client in pursuing that course of action if it is inconsistent with the exercise of independent professional judgment by the lawyer. Nor does it mean that the fees incurred in pursuing that course of action must be allowed." *Id*. The Court emphasizes that irrespective of the arguments made at the March hearing, its conclusion remains the same that the fees for services rendered in connection with the Co-Debtor Motion are unreasonable.

20

Therefore, the Court will disallow that portion of the Application related to the fees for services rendered in connection with the motion for sanctions pursuant to § 1301(a). Using the Application's amended summary of services rendered, the total amount disallowed is $6,774.00. The Court will allow the remaining $3,140 ($9,914 in total fees less the $6,774 disallowed) in requested fees for post-confirmation services rendered in connection with representing the Debtor's estate. The Court is contemporaneously entering the appropriate order.

Signed on November 29, 2011

> /s/ Walter Shapero
> Walter Shapero
> United States Bankruptcy Judge